# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GARY SEBASTIAN BROWN, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 21-cv-01639 (RBW)** |
| | ) | |
| **FEDERAL BUREAU OF** | ) | |
| **INVESTIGATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

The plaintiff, Gary Sebastian Brown, III, proceeding *pro se* and *in forma pauperis*, brings this lawsuit against the defendant, the Federal Bureau of Investigation ("FBI"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *See* Complaint, ECF No. 1, at 1. Currently pending before the Court is the FBI's Motion for Summary Judgment ("MSJ"), ECF No. 23, along with its accompanying statement of material facts ("SOF"), ECF No. 23-1; the FBI's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("MSJ Mem."), ECF No. 23-2; the Declaration of Michael G. Seidel—the FBI's Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD")("Seidel Decl."), ECF No. 23-3; and the FBI's supporting Exhibits ("MSJ Exs."), ECF No. 23-4. In response, the plaintiff filed his Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 25, along with his supporting Exhibits to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opp'n Exs."), ECF No. 25-1, to which the FBI filed its Reply ("Def.'s Reply"), ECF No. 27. On May 26, 2023, the plaintiff filed a Motion for Leave to Amend/Supplement his Opposition, ECF No. 28, and with it, filed what the Court construes as a

1

Surreply ("Surreply"), ECF No. 29.  Even though neither this Court's Local Rules nor the Federal

Rules of Civil Procedure provide the right to file a surreply, given the plaintiff's *pro se* status, the

Court will grant his request that his Surreply be considered in resolving the defendant's request

for summary judgment.  After review of the entire record, and for the reasons stated herein, the

FBI's Motion for Summary Judgment will be granted in full, and this matter will be closed.

## BACKGROUND

On November 7, 2019, Brown submitted a FOIA Request to the FBI requesting:

> any witness accounts, narratives, or statements provided by witnesses
> from an incident which occurred on December 2nd, 2015 at the Inland
> Regional Center in San Bernardino, CA. This was a high profile massacre
> involving some 14 dead and 22 injured, allegedly committed by Tashfeen
> Malik and Syed Farook. Specifically, I am seeking accounts, narratives,
> and statements from witnesses who were located in the conference room
> where the attack mainly took place. Of particular importance to this
> requester are any descriptions of the perpetrators such as, the number of
> attackers, their behavior, apparel, equipment, and any other details
> regarding their appearance.

MSJ Ex. A (FOIA Request); *see* Seidel Decl. ¶ 6.  Upon receipt of this request, the FBI conducted

a search to determine if there were any previously processed records responsive to the Request,

and successfully located records about the December 2, 2015 terrorist attack and mass shooting at

the Inland Regional Center in San Bernardino, California.  *See* Seidel Decl. ¶ 7.  The FBI

responded to the plaintiff by letter on November 25, 2019, assigning the plaintiff's FOIA Request

"No. 1452736-000," and enclosing 19 pages of records that were previously released.  *Id*.; *see* MSJ

Ex. B (Letter Dated 11/25/19).  The FBI further indicated that the plaintiff could request an

additional search for records if he was unsatisfied with what he had been provided.  *Id*.

On December 12, 2019, the plaintiff requested that the FBI continue its search and provide

him with additional records.  Seidel Decl. ¶ 8; *see* MSJ Ex. C (Letter Dated 12/12/19).  On January

3, 2020, the FBI sent a letter to the plaintiff, acknowledging the plaintiff's request, and reassigning his FOIA Request "No. 1452736-001." Seidel Decl. ¶ 9; *see* MSJ Ex. D (Letter Dated 1/2/20).

On February 26, 2020, the FBI advised the plaintiff that the material he requested was found in an investigative file that was exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A) due to an associated pending or prospective law enforcement proceeding, and that release of the information could interfere with that proceeding. Seidel Decl. ¶ 10; *see* MSJ Ex. E (Letter Dated 2/26/20). The FBI also indicated that it was administratively closing FOIA Request No. 1452736-001 and advised the plaintiff of his right to appeal that decision. *See* MSJ Ex. E. Presumably, the plaintiff did not receive this letter because, on July 15, 2020, he contacted the FBI, indicating that he that was still awaiting a response to FOIA Request No. 1452736-001. *See* Seidel Decl. ¶ 11; *see* MSJ Ex. F (Letter Dated 7/15/20). In response, the FBI then reopened the matter on July 29, 2020, reassigned it "No. 1452736-002," and re-sent the plaintiff the letter dated February 26, 2020. Seidel Decl. ¶ 12; *see* MSJ Ex. G (Letter Dated 7/29/20).

On September 17, 2020, the plaintiff appealed the FBI's withholdings pursuant to § 552(b)(7)(A), *see* Seidel Decl. ¶ 13; MSJ Ex. H (Appeal Letter), and on December 1, 2020, the Department of Justice's Office of Information Policy ("OIP") affirmed the FBI's determination, *see* Seidel Decl. ¶ 13; MSJ Ex. I (OIP Acknowledgment Letter); MSJ Ex. J (OIP Decision as to Appeal No. A-2021-02231).

In May 2022, the FBI's Los Angeles Field Office determined the associated investigation was no longer pending, rendering the FBI's previous categorical reliance on § 552(b)(7)(A) inapplicable. Seidel Decl. ¶ 15. On July 29, 2022, the FBI made its second and final release of records to the plaintiff, advising that it had reviewed 411 pages, releasing 406 pages part, withholding five pages in full, and relying on 5 U.S.C. §§ 552(b)(l), (b)(3), (b)(6), (b)(7)(A),

(b)(7)(C), (b)(7)(D), and (b)(7)(E) for the information withheld.  *See id.* ¶¶ 16, 90–92; MSJ Ex. K (Release Letter Dated 7/29/22); *see also* Opp'n Ex. B, ECF No. 25-1 (the FBI's FOIA Release).

## LEGAL STANDARD OF REVIEW

FOIA "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  FOIA accordingly "mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions." *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 72 (D.D.C. 2018) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001); 5 U.S.C. § 552(a)(3)(A), (b)).  And "even if some materials from the requested record are exempt from disclosure, any reasonably segregable information from those documents must be disclosed after redaction of the exempt information," unless the non-exempt portions are "inextricably intertwined with exempt portions." *Id.* (internal quotation marks omitted) (quoting *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  An agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). To carry

its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Priv. Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).

## DISCUSSION

I.    <u>Adequacy of the Search</u>

The adequacy of an agency's search is measured by a standard of reasonableness under the attendant circumstances. *Truitt v. Dep't of State*, 897 F. 2d 540, 542 (D.C. Cir. 1990).  To satisfy its burden, an agency must show that it "has conducted a search reasonably calculated to uncover all relevant documents." *Elliott v. Dep't of Agric.*, 596 F. 3d 842, 851 (D.C. Cir. 2010) (quotation omitted), *cert. denied*, 560 U.S. 973 (2010).  It may base its showing on declarations submitted in good faith, *see Truitt*, 897 F.2d at 542, provided that they explain, in reasonable detail, the scope and method of the search, *see Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007) (internal citations omitted).

Once the agency has provided a "reasonably detailed" declaration, the burden shifts to the FOIA requester to produce "countervailing evidence" suggesting that a genuine dispute of material fact exists as to the adequacy of the search.  *Id.* (internal citation and quotation marks omitted). "In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance[.]"  *North v. DOJ*, 774 F. Supp. 2d 217, 222 (D.D.C. 2011) (citing *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).  Here, the Court finds that the FBI has submitted a reasonably detailed declaration establishing that it conducted an adequate search.

The FBI's declarant, Seidel, has considerable tenure and a wealth of experience in evaluating FOIA requests, *see* Seidel Decl. ¶¶ 1–3, and attests, in his official capacity, that he (1) is well-versed in the procedures employed by the agency, and (2) has personal knowledge of FOIA Request Nos. 1452736-000, 1452736-001, and 1452736-002, *id*. ¶ 3. In addition to being reasonably detailed, the Declaration appears to have been made in good faith.

Seidel identifies and details the record systems and locations searched by the FBI, including why the relevant information would be in those locations and systems, the search terms used to conduct the search, and the scope of the search. *See id*. ¶¶ 17–27. More specifically, he details the FBI's Central Records System ("CRS") and the other internal electronic, integrated case management systems and their indices, most specifically, "Sentinel" (and the now-integrated Automated Case Support—"ACS") and explains why the FBI searched those databases. *See id*. He further states that RIDS conducted a search of the CRS for potentially responsive records, by employing its automated indices, available through Sentinel via its search function, by using the search term "Inland Regional Center," and it successfully located responsive records for "witness interviews," tailored to the scope of the plaintiff's FOIA Request. *See id*. ¶¶ 24–27; *see also* MSJ Ex. A.

Put simply, the FBI searched sites where the information was reasonably likely to be found. *See* Seidel Decl. ¶¶ 24–27. Seidel states that

> CRS is indexed in a manner that meets the FBI's investigative needs and priorities and allows FBI personnel to locate pertinent files. The general indices comprise multiple indices (including Sentinel . . . ) on a variety of subjects to include individuals, organizations, events, and other subjects of investigative interest that are indexed for future retrieval.

*Id.* ¶ 20. Furthermore, he represents that

> FBI personnel rely on Sentinel to locate records and documents to fulfill essential functions, such as conducting criminal, counterterrorism, and

6

> national security investigations; background investigations; citizenship
> and employment queries; and security screening, to include presidential
> protection. Sentinel's index search methodology allows FBI personnel to
> query the CRS for indexed subjects in case files.

*Id.* ¶ 22.   Seidel explains that these  "indices are comparable to a digital version of a library's card catalog[,]" and are neatly organized by "main entries" (for subjects of an investigation) and "reference entries" (for non-subjects associated with as investigation), all of which contain information regarding associated individuals, organizations, and events. *See id*. ¶¶ 20–21.  Indeed, RIDS searched CRS and Sentinel because those indices "provide access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects and consist of millions of searchable records that are updated daily with newly indexed information." *Id.* ¶ 24.

Seidel expressly attests that the search was adequate and reasonably likely to locate responsive records, *see id*. ¶¶ 17, 25–26, 28, and based on the information provided, the Court agrees.  *See Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015) (finding the FBI's search of the CRS to be adequate because of, in part, an agency declaration asserting that the FBI's search was "reasonably likely to produce the information [the plaintiff] requested") (citation omitted).

In response, the plaintiff argues that the FBI's search was "not diligent and reasonable as the scope of [his] request was construed as a request for interviews only." Pl.'s Opp'n at 3.  He concedes, however, that his request for witness "accounts, narratives, and statements," MSJ Ex. A, would likely be included in the FBI's search for "interviews," but then speculates that additional materials in those three sub-categories could exist outside of the "interview" umbrella, *see* Pl.'s Opp'n at 3; *see also* Surreply at 3–9.  For example, he contends that potential audio recordings and transcripts of 911 calls—which he has heard on television news—do not constitute "interviews," but may be available to the FBI in a more expanded search.  *See* Pl.'s Opp'n at 3; Surreply at 3–4,

7.  He also conjectures that potential "logs or audio records of police radio communications[,]" and "raw recordings of witness interviews[,]" may exist outside of the FBI's existing search parameters.  *See* Pl.'s Opp'n at 3–4.

An agency has a duty to construe a FOIA request liberally. *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  But "even a 'liberal' reading" of the plaintiff's FOIA Request does not support his assertion that the FBI was somehow obligated to retrieve local law enforcement logs, or outside media and audio recordings, based on the scope of his request.  *See Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 169–70 (D.D.C. 2016) (internal quotation marks and citations omitted) (finding both the CIA's interpretation of a FOIA request and its search to be reasonable after the plaintiff argued that his request was misread, and contended the agency's interpretation was "overly narrow," because an agency is not obligated to search for tangential material); *see also Leopold v. Dep't of Justice*, 301 F. Supp. 3d 13, 25 n.6 (D.D.C. 2018) (explaining the difference between an agency improperly delimiting a search, versus properly and necessarily narrowing the scope of a search to facilitate retrieving the records actually requested); *Dillon v. Dep't of Justice*, 102 F. Supp. 3d 272, 286–87 (D.D.C. 2015) (finding that "an agency's decision to conduct a 'targeted search' based on the scope of the plaintiff's request is proper under the FOIA") (quoting *Bloomgarden v. Dep't of Justice*, 10 F. Supp. 3d 146, 153 (D.D.C. 2014) (agreeing with agency's assertion that its "targeted search for personnel documents . . . was reasonable in light of the narrow nature of [the] plaintiff's request[.]")).

Additionally, the FBI "need not extend the meaning of the request to include things not asked for." *Wallick v. Agrig. Marketing Srvc.*, 281 F. Supp. 3d 56, 68 (D.D.C. 2017) (concluding that the defendant properly interpreted the request and conducted an adequate search where the plaintiff unreasonably expected the agency to interpret his request in a nuanced manner beyond its

8

plain meaning) (collecting cases). And the plaintiff's own preferences and suppositions cannot dictate the reasonableness of the scope of the FBI's search. *Id.* ("[U]nder [the plaintiff's] approach, which would allow a requester to dictate, through search instructions, the scope of an agency's search, the reasonableness test for search adequacy long adhered to in this circuit would be undermined."). This is particularly important where, as here, a plaintiff has presented only mere speculation that additional materials might be found in the possession of an agency, *see Meeropol v. Meese*, 790 F.2d 942, 954 (D.C. Cir. 1986), and a requester is only entitled to records actually retained by the agency, *see Bonfilio v. Occupational Safety & Health Administration*, 320 F. Supp. 3d 152, 157 (D.D.C. 2018) (citing *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004); *Yeager v. DEA*, 678 F.2d 315, 321 (D.C. Cir. 1982)). And to the extent that the plaintiff, after reviewing the FBI's release of records, now seeks to expand the scope of his FOIA Request by and through this litigation, he may not do so. *See, e.g., Houser v. Church*, 271 F. Supp. 3d 197, 204 (D.D.C. 2017) (finding that a requester may not "expand the scope of his FOIA request in the course of litigation") (citing *Donoghue v. Office of Info. Policy, Dep't of Justice*, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016); *Coss v. Dep't of Justice*, 98 F. Supp. 3d 28, 34 (D.D.C. 2015)).

Even assuming *arguendo* that the FBI is in possession of call-center transcripts, logs or audio of police radio communications, or other "raw recordings," *see* Pl.'s Opp'n at 3–4; Surreply at 3–4, 7, the plaintiff's FOIA Request, as drafted, does not mandate or ensure their retrieval. "A search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request[,]" *Meeropol*, 790 F.2d at 956, and in any event, a search "is not unreasonable simply because it fails to produce all relevant material[,]" *id.* at 952–53; *see Mobley*, 806 F.3d at 583 (collecting cases).

"In determining the proper scope of a FOIA request, '[t]he linchpin inquiry is whether the agency is able to determine 'precisely what records (are) being requested.'" *McKinley v. FDIC*, 807 F. Supp. 2d 1, 5 (D.D.C.2011) (alterations in original) (quoting *Yeager*, 678 F.2d at 326); *see also American Chemistry Council, Inc. v. Health & Human Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013) ("Agencies . . . need not expand their searches beyond 'the four corners of the request,' nor are they 'required to divine a requester's intent.'") (quoting *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003)).  Here, the FBI analyzed the plaintiff's FOIA Request and determined that a search of the CRS automated index, via Sentinel, would locate responsive material. *See* Def.'s Reply at 2–3 (quoting Seidel Decl. ¶ 24).  It searched "millions of searchable records that are updated daily with newly indexed information[,]" and specifically searched for records involving the San Bernadino shooting.  *See id*. at 3 (quoting Seidel Decl. ¶¶ 17, 24–25). In doing so, it retrieved over 400 pages of records, *see* Seidel Decl. ¶¶ 16, 90–92, comprised of "FD-302s"—internal FBI forms that memorialize a myriad of evidence and information from witness interviews, compiled in furtherance of the FBI's investigation and for potential use in future court proceedings, *see* MSJ Ex. L (*Vaughn* Index) ("VI") at A2, and it then released, in part, nearly all of them, *see* Opp'n Ex. B.

The Court finds it reasonable that the FBI construed the plaintiff's request for witness "accounts, narratives, and statements" as witness "interviews," and that the FD-302s would be the source where responsive records would be found, given the purpose of the FD-302 and the comprehensive nature of the information contained therein.  *See id*.  All circumstances considered, (1) the FBI properly interpreted the scope of the plaintiff's FOIA Request, and (2) its search parameters and methods were appropriate.  *See, e.g., Cole v. Copan*, No. 19-cv-1182, 2020 WL 7042814, at *4 (D.D.C. Nov. 30, 2020) (entering summary judgment for the defendant and finding

that the plaintiff's challenge to the scope of the agency's search, based on a semantics debate over, *inter alia*, the interpretation of the phrase "input data," was an improper attempt to reframe his request) (citing *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (upholding a district court's narrow interpretation of a FOIA request where the request did not "reasonably suggest" the broad scope argued by the plaintiff)).   In sum, the Court finds that the FBI has met its burden in showing that it conducted an adequate search.

II.      Adequacy of the *Vaughn* Index

In FOIA cases, a motion for summary judgment is typically supported by a "*Vaughn* index," as derived from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).   No set formula exists for an adequate *Vaughn* index, because "the critical elements of the *Vaughn* index lie in its function, and not its form." *Kay v. FCC*, 976 F. Supp. 23, 35 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998). The purpose of a *Vaughn* index is "to permit adequate adversary testing of the agency's claimed right to an exemption," and thus must contain "an adequate description of the records" and "a plain statement of the exemptions relied upon to withhold each record."  *Nat'l Treas. Emps. Union v. Customs Serv.*, 802 F.2d 525, 527 n.9 (D.C. Cir. 1986).

Although a *Vaughn* index can be an important component of FOIA briefing,

> the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'

*Citizens for Resp. & Ethics in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Spirko v.*

11

Case 1:21-cv-01639-RBW   Document 31   Filed 08/18/23   Page 12 of 38

*USPS*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing similar information can suffice.") (citing *Gallant v. NLRB*, 26 F.3d 168, 172–73 (D.C. Cir. 1994)).

As noted above, the located documents consisted of FD-302s, which are adequately described by the FBI. *See* VI at A2. The FBI's *Vaughn* Index, *see* VI at A1–A2, 1–10, and the comprehensive Declaration submitted by Seidel, *see* Seidel Decl. ¶¶ 28–92, considered together, sufficiently describe the records (or portions of records) withheld and their associated Bates numbers, as well as the exemptions justifying the associated information withheld. *See id.*; VI at A1–A2, 1–10. For these reasons, the Court finds that the *Vaughn* Index, along with the Seidel Declaration, are sufficiently specific "to permit adequate adversary testing of the agency's claimed right" to the FBI's reliance on the invoked exemptions. *Nat'l Treas. Emps. Union*, 802 F.2d at 527.

III.    FOIA Exemptions & Segregability

The FBI relied on several different FOIA exemptions in withholding information requested by the plaintiff. *See* Seidel Decl. ¶¶ 12–13; *see generally* Opp'n Ex. B. Notably, "even if [the] agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) (internal quotation marks and citation omitted). "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (quoting *Mead Data Cent.*, 566 F.2d at 260). Thus, an agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C.

2010) (internal quotation marks and citation omitted), *aff'd sub nom.*, 666 F.3d 1330 (D.C. Cir. 2010). However, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" from the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007), *aff'd sub nom.*, 666 F.3d 1330 (D.C. Cir. 2011).

A declaration and/or *Vaughn* index attesting to the performance of a review of the documents, and describing the withholdings, satisfies the FOIA's segregability requirement. *See, e.g., Johnson*, 310 F.3d at 776; *Loving v. Dep't of Justice*, 550 F.3d 32, 41 (D.C. Cir. 2008), *cert. denied*, 558 U.S. 945 (2009). Here, the FBI attests that Seidel and others extensively reviewed the responsive material and that all non-exempt and segregable information was produced. *See* Seidel Decl. ¶¶ 90–93.

The plaintiff's challenge to the FBI's use of its exemptions is difficult to comprehend and somewhat amalgamated. At the outset, he states that he "does not take issue with the language of Defendant's [redaction and withholding] justifications [under the asserted exemptions] and concedes that any such content rightly identified under said justification are properly withheld," and he indicates that he only objects to the FBI's segregability analysis. *See* Pl.'s Opp'n at 5. However, his segregability challenge reveals that he, at least in part, challenges the use of certain exemptions. *See id.* at 5–42; Surreply at 8–19. More specifically, he asserts that the descriptions of the shooters are segregable and should be released, and in doing so, challenges the FBI's redaction of that information pursuant to Exemptions 6 and 7(C), and Exemption 7(D), on the documents designated as Bates Nos. 1–4, 6–7, 16–17, 24–27, 30–31, 33, 35–36, 38–39, 43–44, 47, 50–51, 54, 58, 61–62, 74–76, 78–79, 81–82, 85–86, 87–88, 93–94, 96–99, 101–102, 106–07, 101– 102, 106–07, 109, 111–12, 114, 116–17, 120–21, 124, 126–27, 130, 133–34, 137–38, 139–40,

143, 146–47, 153–54, 156–57, 159, 160–61, 163, 165–70, 174–75, 177–78, 180–81, 185–89, 196–99, 201–02, 206, 208–09, 211–12, 213, 219–20, 223–24, 227–28, 234–37, 241–43, 248–49, 253–54, 259–61, 267–68, 272–73, 277, 278–79, 280, 283–84, 286–87, 290, 293–98, 300–10, 313–46, 349–63, 365–66, 369–70, 373–74, 380–81, 384,[1] 387–88, 391–93, 396–97, 403, and 407–10. *See id.* The Court will thus discuss the propriety of each of the FBI's noted exemptions, and where relevant, the segregability of the information withheld thereunder.

A. 5 U.S.C. § 552(b)(1) ("Exemption 1")

The FBI relies on FOIA Exemption 1 as the basis for withholding certain information, *see* Seidel Decl. ¶ 34–35, and the plaintiff presents no opposition to its use of this Exemption. FOIA Exemption 1 provides that matters "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder" are exempt from production under the FOIA. 5 U.S.C. § 552(b)(1). "The [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. Dep't of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)); *see also Morley*, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified.").

The FBI withheld information pursuant to Exemption 1 under Executive Order 13526 ("EO 13526"), *see* Seidel Decl. ¶ 34–35; VI at 1, 2, 9 (withholding in part Bates Nos. 42, 46, 49, 53, 57, 60, 64, 66, 364, 368, 372, 376, 379, 383, 386, 390, and 395), which establishes procedural and

---

[1]     Exemption 6 and 7(C) are both used as the basis for redacting information on this page, but not Exemption 7(D). *See* VI at 9.

substantive requirements for classification of eight categories of national security information, *see* 75 Fed. Reg. 707 (Dec. 29, 2009).

> [I]f information that is responsive to a FOIA request fits into any of the eight categories, and if an original classifying authority has designated the information classified based on that authority's determination that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, the information has properly been deemed 'classified' and the government can invoke Exemption 1 to withhold the information from disclosure under the FOIA.

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 296 F. Supp. 3d 109, 124–25 (D.D.C. 2017).  Here, the FBI specifically relies on § 1.4(c), *see* Seidel Decl. ¶¶ 37–45, which protects the category of information pertaining to "intelligence activities (including covert action), intelligence sources or methods, or cryptology" if that information "could reasonably be expected" to damage national security, *see* EO 13526 75 § 1.4(c).

Seidel attests that he "personally and independently examined the information withheld pursuant to FOIA Exemption (b)(1) . . . [and] determined that the classified information continues to warrant classification at the 'Secret' level . . . pursuant to E.O. 13526 § 1 .4(c)[.]" Seidel Decl. ¶ 36.  This he asserts is "because its release would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; and/or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets." *Id.* ¶ 38.  Seidel further maintains that disclosure of this "specific information regarding the intelligence activities[,]" for which this Exemption was asserted, "could reasonably be expected to cause serious damage to the national security," because: "(1) disclosure would reveal current targets of specific FBI national security investigations; and (2) disclosure would reveal the criteria used and priorities assigned to current intelligence or counterintelligence investigations."  *Id.* ¶ 39. Indeed,

the FBI asserts that "hostile entities could develop countermeasures which would . . . severely disrupt the FBI's intelligence gathering capabilities . . . [and] efforts to detect and apprehend violators of the United States' national security and criminal laws." *Id.*

The FBI represents that it protected three catagories of information under this Exemption. *See id.* ¶ 40–45.  First, it withheld a classified intelligence file number "assigned to specific intelligence activities, including channelization and dissemination instructions." *Id.* ¶ 41.  These "individual file numbers are assigned by FBIHQ and field offices and contain a numerical characterization of the investigation type, geographical prefix or the originating office, and a chronological number assigned to a specific investigation or activity." *Id.* ¶¶ 19, 41.  Seidel explains that disclosure of this file number would allow "adversaries to attribute any information released from records containing such a file number to that particular investigation[,]" affording them the opportunity to ultimately "patch bits and pieces of information together until the [intelligence] activity is determined . . . [,]severely limiting its use." *Id*. ¶ 42.  Moreover, he states that such identification

> "will inform adversaries of the possible range of the FBI's intelligence capabilities, as well as the probable intelligence the FBI has gathered, or can collect, concerning them . . . [,]provid[ing] violators of the United States' national security laws with a means of avoiding lawful regulations by potentially initiating countermeasures . . . [,][thus] making future operations more difficult, and compromising other ongoing planned intelligence operations."

*Id*.

Additionally, the FBI withheld "classified information concerning the character and title of the case for a specific type of intelligence activity directed at a specific target of national security interest." *Id*. ¶ 43.  Seidel explains that such disclosure risks identifying a particular investigation

and its "nature, scope, or thrust . . . [and] the manner of acquisition of the intelligence information." *Id.*

Finally, the FBI withheld information that could identify the targets of an investigation. *See id*. ¶ 44. Seidel represents that such disclosure would "provide a description of an intelligence source's penetration of a specific target of national security during a specific time period[,]" thus allowing (1) "hostile individuals or foreign governments to appraise the scope, focus, location, target, and capabilities of the FBI's intelligence-gathering methods and activities," (2) "hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless[,]" and (3) disruption to "the FBI''s intelligence- gathering capabilities." *Id*. ¶ 45.

Based upon consideration of all of this information, the Court finds that the FBI has offered sufficient factual detail for the Court to conclude that the categories of information withheld under Exemption 1 may be classified according to EO 13526, and that it was properly classified pursuant to that Order. In fact, Seidel actually describes the withheld information in more detail than required under Exemption 1. *See, e.g.*, *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 166 (D.D.C. 2013) ("Although many details of these two documents remain unknown, the [government]'s declaration plausibly establishes that the withheld information relates to sensitive operations within the Intelligence Community, the substance of which is properly classified in the interest of national security. That is sufficient to grant summary judgment."); *DiBacco v. Dep't of the Army*, 983 F. Supp. 2d 44, 61 (D.D.C. 2013) (finding that, where the government has provided a "reasonable level of specificity that the information at issue was properly classified[,]" information was properly withheld under Exemption 1), *aff'd in relevant part*, 795 F.3d 178, (D.C.

Cir. 2015). Accordingly, and with no challenge from the plaintiff, the Court concludes that the FBI

properly withheld this information pursuant to Exemption 1.[2]

    B.  <u>5 U.S.C. § 552(b)(3) ("Exemption 3")</u>:

    Pursuant to Exemption (b)(3), an agency may withhold information "specifically exempted

from disclosure by statute," 5 U.S.C. § 552(b)(3), so long as the statute:

> (A)(i) requires [withholding] from the public in such a manner as to leave
> no discretion on the issue; or (ii) establishes particular criteria for
> withholding or refers to particular types of matters to be withheld; and

> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009,
> specifically cites to this paragraph.

*Id.* To prevail on summary judgment based on this Exemption, the FBI "need only show that the

statute claimed is one of exemption as contemplated by Exemption [(b)(3)] and that the withheld

material falls within the statute." *Larson*, 565 F.3d at 865 (citation omitted). Notably, "the Court

must defer to the FBI's determination, because [t]he judiciary 'is in an extremely poor position to

---

[2]    Regarding Exemption 1, the FBI also concomitantly invoked 5 U.S.C. § 552(b)(7)(A) ("Exemption 7(A)")—which protects from disclosure records or information compiled for law enforcement purposes, to the extent that the production of that information could reasonably be expected to interfere with enforcement proceedings—*see id.*, in redacting the "FBI file number, scope, nature, and target of a pending investigation because it would reveal publicly unknown information concerning pending enforcement procedures." MSJ Mem. at 11 n.2; Seidel Decl. ¶ 71; VI at 1–2, 9 (also withholding in part, pursuant to Exemption 7(A), Bates Nos. 42, 46, 49, 53, 57, 60, 64, 66, 364, 368, 372, 376, 379, 383, 386, 390, and 395). While the Court is satisfied that these redactions were properly made under Exemption 1, it notes that § 552(b)(7)(A) applies equally to the withheld information. *See Shapiro v. Dep't of Justice*, No. 12-cv-313, 2020 WL 3615511, at *16–*18 (D.D.C. July 2, 2020) (finding that the FBI properly withheld information pursuant to Exemption 7(A), derived from "closed" law enforcement files, because the FBI expressed concerns about "overlap" with other pending enforcement proceedings, and it "reviewed all documents with an eye toward the so-called 'mosaic' effect[,]" by which "an individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself.") (quoting *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980); citing *CIA v. Sims*, 471 U.S. 159, 178 (1985); *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003)), *aff'd in relevant part*, 40 F.4th 609 (D.C. Cir. 2022), *cert. denied*, 143 S.Ct. 526 (2022); *see also* Seidel Decl. ¶¶ 42, 70–71.

second-guess the predictive judgments made by the government's intelligence agencies regarding the risk of disclosure or the harm posed by such disclosure." *Citizens United v. Dep't of State*, No. 18-cv-1862, 2021 WL 3268385, at *6 (D.D.C. Jul. 29, 2021) (internal quotation marks omitted) (quoting *Larson*, 565 F.3d at 865; *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 928.

Here, the FBI has exempted information pursuant to § 102A(i)(1) of the National Security Act of 1947, *see* Seidel Decl. ¶¶ 46–50; VI at 1–10 (withholding in part Bates Nos. 1–376, 379–83, 386–411), which requires the Director of National Intelligence ("DNI") to "protect from unauthorized disclosure intelligence sources and methods[,]" 50 U.S.C. § 3024(i)(1). The plaintiff has not challenged the FBI's use of Exemption 3.

"The DNI has delegated enforcement of this National Security Act mandate to the heads of the 17 agencies that constitute the Intelligence Community," *Elec. Privacy Info. Ctr.*, 296 F. Supp. 3d at 121 (internal quotation marks, citation, and alterations omitted), and the FBI is one of those delegees, *see* 50 U.S.C. § 3003(4)(H).  There can be no "dispute that the National Security Act satisfies the second criterion mentioned above because" it was enacted before the OPEN FOIA Act of 2009, *see id.*, and it 'refers to particular types of matters to be withheld'—namely, 'intelligence sources and methods.'"  *Leopold v. CIA*, 106 F. Supp. 3d 51, 57 (D.D.C. 2015) (quoting *ACLU*, 628 F.3d at 619); *see Sims*, 471 U.S. at 167 (explaining that the "conclusion [that the National Security Act is a withholding statute] is supported by the plain meaning of the statute, by the legislative history of the FOIA, and by every federal court of appeals that has considered the matter"); *DiBacco v. U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015) (noting that the plaintiff "does not dispute, nor could she, that Section 3024(i)(1) is a valid Exemption 3 statute").

Having found that the FBI has met the second element,[3] the Court considers whether it has met the first element; i.e., it must determine whether the FBI's withholdings "satisfy the criteria of the exemption statute." *Fitzgibbon*, 911 F.2d at 761.  The Court finds the answer to that question to be in the affirmative.  The FBI has invoked Exemption 3, largely in conjunction with Exemption 1 (and with 5 U.S.C. § 552(b)(7)(E), discussed below), to protect information that, as already determined above, concerns intelligence activities and methods relating to the underlying investigation.  *See* Seidel Decl. ¶¶ 37–40, 50.  Seidel's Declaration sufficiently explains that Exemption 3 applies, namely, because the information withheld from the FBI's internal documents could reasonably be expected to lead to unauthorized disclosure of intelligence sources or methods. *See id*. ¶¶ 47–50; *see also Shapiro v. Dep't of Justice*, 37 F. Supp. 3d 7, 27 (D.D.C. 2014). Therefore, the Court finds that the information was properly withheld under Exemption 3.

C.  <u>5 U.S.C. §§ 552(b)(6), (b)(7)(C) ("Exemption 6 and 7(C)")</u>

The FBI invokes FOIA Exemptions 6 and 7(C) for many of its withholdings. *See* Seidel Decl. ¶¶ 53–69.  "[B]ecause the Court concludes that the FBI's withholding decisions [were] justified under the standard imposed under Exemption 7(C), it need not reach the question of whether the FBI's withholdings are independently justified under Exemption 6." *Schoenman v.*

---

[3]      As noted above, qualifying statutes under 5 U.S.C. § 552(b)(3)(A)(ii) may refer to either "particular types of matters to be withheld[,]" or to "particular criteria for withholding" information, *see id*.  Statutes that fall into the latter category require "a formula whereby the administrator may determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw in the disclosing of the information[,]" and if the agency withholds that information under Exemption 3, and the requester challenges that withholding, a court must review whether the agency "followed the particular criteria established. . ." in withholding that information.  *See Pub. Citizen, Inc. v. Mineta*, 444 F. Supp. 2d 12, 17–18 (D.D.C. 2006) (quoting *Am. Jewish Congress v. Kreps*, 574 F.2d 624, 628–29 (D.C. Cir. 1978)) (internal quotation marks omitted), *aff'd*, 533 F.3d 810 (D.C. Cir. 2008).  Because § 102A(i)(1) falls into the former category—i.e., referring to the types of matters to be withheld, *see* 5 U.S.C. § 552(b)(A)(i), the Court need not conduct such an assessment.  *See Ass'n of Ret. R.R. Workers, Inc. v. U.S. R.R. Retirement Bd*., 830 F.2d 331, 337 (D.C. Cir. 1987).

*FBI*, 763 F. Supp. 2d 173, 198 n.16 (D.D.C. 2011), *appeal dismissed*, Nos. 12–5079, 12–5216, 2012 WL 3244009 (D.C. Cir. Jul. 31, 2012). Accordingly, the Court will only conduct an analysis under Exemption 7(C).

First, to invoke *any* subsection of § 552(b)(7), a threshold test must first be satisfied. Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes[.]" 5 U.S.C. § 552(b)(7); *see Abramson*, 456 U.S. at 622. In assessing whether records were compiled for law enforcement purposes, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Justice,* 284 F. 3d 172, 176–77 (D.C. Cir. 2002) (citations and internal quotations omitted).

The FBI is, by definition, a criminal investigatory and regulatory law enforcement agency within the Department of Justice. *See* 28 U.S.C. § 531 ("The Federal Bureau of Investigation is in the Department of Justice."); *id*. §§ 533–35, 538–540D (listing the many criminal investigatory and regulatory duties of the FBI and its officials). Seidel has stated that all the responsive records withheld pursuant to Exemption 7 were compiled for law enforcement purposes. Seidel Decl. ¶ 25. Additionally, the plaintiff's own purpose for filing this action is rooted in his express interest in criminal investigation records. *See* Compl. ¶¶ 5, 7–12; FOIA Request; *see also Blackwell v. FBI*, 646 F. 3d 37, 40 (D.C. Cir. 2011) (finding that, where the plaintiff sought records relating to a criminal investigation and prosecution, it was "quite obvious[]" that the records were compiled for law enforcement purposes); *Roberts v. FBI*, 845 F. Supp. 2d 96, 103 (D.D.C. 2012) (same). Having satisfied its threshold burden, the Court therefore concludes that the responsive FBI records were compiled for law enforcement purposes. The Court must then address the

applicability of the cited subsections of Exemption 7.  *See* 5 U.S.C. § 552(b)(7); *see also Abramson*, 456 U.S. at 622.

Exemption 7(C) protects from disclosure records compiled for law enforcement purposes to the extent that their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In assessing this question, a court must balance the privacy interests in nondisclosure against the public interest in "shed[ding] light on an agency's performance of its statutory duties." *DOJ v. Rept's Comm. for Freed. of Press*, 489 U.S. 749, 773 (1989).  In other words, the proper application of "privacy exemptions [6 and 7(C)] turns on a balance of the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *CEI Wash. Bureau, Inc. v. DOJ*, 469 F.3d 126, 128 (D.C. Cir. 2006) (citation and internal quotation marks omitted).  Thus, when a requester seeks such information, an agency must conduct a balancing test to determine if releasing the information "could reasonably be expected to constitute an unwarranted invasion of personal privacy[,]" *id*. at 127 (quoting 5 U.S.C. § 552(b)(7)(C)), by balancing "the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny[,]" *id*. at 128 (citation omitted).  It is this balancing test and "not the nature of the files in which the information was contained [that] limit[s] the scope of the exemption."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F. 3d 26, 33 (D.C. Cir. 2002).

Here, under Exemption 7(C), the FBI withheld names and other identifying information of: (1) FBI personnel and staff, (2) local law enforcement personnel and staff, (3) third parties who assisted the investigation by providing information, (4) third parties of investigative interest, (5) third parties "merely mentioned," (6) third party victims, and (7) non-FBI government personnel. *See* Seidel Decl. ¶¶ 53–69; *see* FBI VI at 1–10 (withholding in part Bates Nos. 1–148, 152–82,

184–411).  For the reasons explained below, the Court finds that the FBI was justified in its reliance

on Exemption 7(C).

Disclosure of the personal information of law enforcement personnel and staff (both federal

and local), third parties who assisted the FBI in its investigation, third parties of investigative

interest, third parties mentioned, and non-FBI federal government personnel, *see Schoenman*, 763

F. Supp. 2d at 198 (finding all of these categories of information to be exempt under Exemption

7(C)), as well as third party victims, *see Bartko v. Dep't of Justice*, 898 F.3d 51, 72 (D.D.C. 2018)

(finding the same as to third party victims); *Sandoval v. Dep't of Justice*, 296 F. Supp. 3d 1, 18–

19 (D.D.C. 2017) (same); *Accurso v. FBI*, No. 19-cv-2540, 2021 WL 411152, at *5–6 (D.D.C.

Feb. 5, 2021) (same); *Shapiro*, 2020 WL 3615511, at *29–32 (same), is ordinarily improper as

disclosure could put all such individuals at risk of a myriad of harms.

Here, as required,

> [t]he FBI has described, plausibly and in considerable detail, the harms
> one might reasonably expect to flow from the public disclosure of such
> information, including: subjecting these individuals to unsolicited scrutiny
> and harassment from the media, the general public, and current and former
> investigatory targets; endangering the safety of individuals who have
> provided information in the course of an investigation; and impairing the
> effectiveness of investigative activities by compromising the identities of
> law enforcement personnel and deterring individuals from providing
> information in the future.

*Schoenman*, 763 F. Supp. 2d at 198–99; *see* Seidel Decl. ¶¶ 53–69.  In the instances where the FBI

employed Exemption 7(C), it weighed the adverse effects of the release of the information to the

individuals involved and the benefit to the public that disclosure could be expected to provide,

concluding that the interest in privacy was greater.  *See Schoenman*, 763 F. Supp. 2d. at 199; *see*

*also* Seidel Decl. ¶ 55.  And "the FBI did not withhold identifying information where it was able

to determine that [an] individual was deceased or was a high-ranking governmental official whose

activities may be of a greater public interest." *Schoenman*, 763 F. Supp. 2d at 199; *see* Seidel Decl.
¶ 56.

These "representations suffice to establish 'a reasonable likelihood' that the disclosure of
such information would result in an unwarranted invasion of personal privacy.  Indeed, courts have
repeatedly upheld identical withholdings." *Schoenman*, 763 F. Supp. 2d at 199 (citing *Amuso v.
Dep't of Justice*, 600 F. Supp. 2d 78, 94–97 (D.D.C. 2009); *Voinche v. FBI*, 412 F. Supp. 2d 60,
68–69 (D.D.C. 2006)).  The FBI's noted concerns significantly outweigh what little benefit the
public may gain from knowing this information regarding its understanding of agency operations.
*See id*. at 198; *see also Nat'l Whistleblower Ctr. v. DHHS*, 849 F. Supp. 2d 13, 28 (D.D.C. 2012)
(same); *Banks v. Dep't of Justice*, 813 F. Supp. 2d 132, 144 (D.D.C. 2011) (same); *Lesar v. Dep't
of Justice*, 636 F. 2d 472, 487 (D.C. Cir. 1980) (same); *Pray v. Dep't of Justice*, 902 F. Supp. 1, 3
(D.D.C. 1995) (same), *aff'd in relevant part*, No. 95-5383, 1996 WL 734142 (D.C. Cir. Nov. 20,
1996).

The Court emphasizes that this protection generally extends to those even passingly
*mentioned* in law enforcement records. *See Schrecker v. Dep't of Justice*, 349 F. 3d 657, 661 (D.C.
Cir. 2003) (collecting cases and recognizing this Circuit's "decisions [which] have consistently
supported nondisclosure of names or other information identifying individuals appearing in law
enforcement records . . ."), because such third party information is "categorically exempt" from
disclosure under Exemption 7(C), in the absence of an overriding public interest in its disclosure);
*Nat. Mag., Wash. Bureau v. Customs Service*, 71 F. 3d 885, 894, 896 (D.C. Cir. 1995)
(acknowledging the "obvious privacy interest" cognizable under Exemption 7(C) and extending
this interest "to third parties who may be mentioned in investigatory files"); *accord Fischer v.
DOJ*, 596 F. Supp. 2d 34, 46 (D.D.C. 2009).

The plaintiff nonetheless expresses suspicions that, where larger swaths of information are redacted under Exemption 7(C), namely, the redactions associated with third-party victims, "[i]t is unlikely" that the bulk of it could be "inextricably intertwined with personally identifying information." *See* Pl.'s Opp'n at 6.  But the plaintiff fails to recognize that, on nearly every page where he has challenged the use of Exemption 7(C), the FBI also applied *additional* exemptions, largely, Exemption 7(D), *see* VI at 1–10; Opp'n Ex. B; Seidel Decl. ¶¶ 75–77.  And as discussed below, Exemption 7(D) certainly justifies this type of larger "block-redaction." *See Comp. Prof'ls for Soc. Resp. v. Secret Serv.*, 72 F.3d 897, 905 (D.C. Cir. 1996); 5 U.S.C. § 552(b)(7)(D).  Because all the plaintiff's arguments regarding these records are predicated on his misconception that Exemption 7(C) was used to redact the descriptions of the shooters, they all are all equally defective.

For example, the plaintiff references Bates Nos. 297–98, which contains some block redactions, and he argues that they must contain information apart from personal identifiers that are subject to Exemption 7(C). *See* Pl.'s Opp'n at 25; Surreply at 17–19; Opp'n Ex. B at Bates Nos. 297–98.  However, those block redactions are also made pursuant to Exemption 7(D), *see* Opp'n Ex. B at Bates Nos. 297–98; Seidel Decl. ¶¶ 75–77, and as noted above, it renders the entire "block" exempt, thus making any segregation of the material impossible.

The plaintiff's remaining arguments are similarly not cognizable.  He focuses inordinately on the FBI's assertion that third-party victims may be forced "to relive traumatic events" if their identities were released.  *See* Surreply at 19–23; Pl.'s Opp'n at 6–7, 34–42; Seidel Decl. ¶ 64.  In doing so, the plaintiff again insists, without basis, that the descriptions of the shooters were redacted under Exemption 7(C), and argues that release of the that information should not cause a victim trauma—even though the FBI never made such a contention.  *See* Surreply at 19–23; Pl.'s

Opp'n at 6–7, 34–42. As an example, he discusses a victim (also a confidential source), who provided information regarding one of the perpetrator's behaviors immediately before and after the shooting.  *See* Surreply at 18; Pl.'s Opp'n at 24–25; Opp'n Ex. B at Bates Nos. 297–98.  He argues that because this information does not describe the shooting itself, it should not cause the victim trauma, and therefore, should be released.  *See* Surreply at 18; Pl.'s  Opp'n at 24–25.

But the descriptions of the perpetrators, provided by this individual and others were, in fact, largely redacted pursuant to Exemption 7(D), not Exemption 7(C). *See* Opp'n Ex. B at Bates Nos. 297–98; Seidel Decl. ¶¶ 75–77.  However, even if they were redacted under Exemption 7(C), the plaintiff cites to no authority to support his speculative argument.  Thus, it is completely unclear why proximate details regarding the event, whether antecedent or subsequent, would somehow be immune from causing a victim trauma.

Moreover, trauma is not the only basis for preventing an unwarranted invasion of a victim's personal privacy.  For instance, as noted by the FBI, the "witnesses' and victims' recounting of these events was provided for use by law enforcement in an official investigation, and not for public consumption. Releasing these individuals' identities in the context of these investigative records would cause unsolicited and unnecessary attention to be focused on these individuals and their families."   Seidel Decl. ¶ 64.  Victims are fundamentally entitled to protection of their "cognizable privacy interest" for many reasons, *see Accurso*, 2021 WL 411152, at *5 (citing *Schrecker*, 349 F.3d at 661) (quotation omitted), and that reason need not be profoundly traumatic; indeed, it can be as simple as seeking to prevent their mere association with the criminal event, *see id*. (citing *Dunkelberger v. Dep't of Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990) ("Exemption 7(C) takes particular note of the strong interest of individuals . . . in not being associated unwarrantedly with alleged criminal activity.") (citation and internal quotation marks omitted)); *see also Nishnic*

*v. Dep't of Justice*, 671 F. Supp. 776, 789–90 (D.D.C. 1987) (collecting cases and holding that Exemption 7(C) "contemplates 'invasions' of widely varied types[,]" including potential embarrassment, reputational harm, annoyance, harassment, discomfort, or stigma).

Finally, and as noted earlier, *see* § III (C) at 24, the D.C Circuit instructs "categorically that[,] unless access to" personal identifiers "of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure[,]" *SafeCard Srvs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991). The plaintiff has not advanced or presented any public interest with respect to the information sought—let alone anything to suggest the FBI's engagement in illegal activity. In fact, in his Surreply, he does not challenge the FBI's position that he has ostensibly failed to demonstrate a public interest. *See* Surreply at 19. He instead argues that he is under no such obligation because Exemption 7(C) was improperly applied to the descriptions of the shooters, a topic that, if released, would be non-traumatic to the reporting witnesses, and would make any privacy intrusion *de minimis*. *See* Surreply at 19–23; *see also* Pl.'s Opp'n at 6–7, 34–42. But once again, these descriptions were redacted, in large part, pursuant to Exemption 7(D), not Exemption 7(C). *See* VI at 1–10; Opp'n Ex. B; Seidel Decl. ¶¶ 75–77. And to the extent the plaintiff actually challenges the FBI's redactions of the victim's personal identifying information withheld under Exemption 7(C), and even if that redacted information also included descriptions of the perpetrators or the incident itself, the FBI has justified those withholdings. *See Lesar*, 636 F. 2d at 487; *see also Steinberg v. Dep't of Justice*, 179 F.R.D. 357, 364 (D.D.C. 1998) (entering summary judgment on behalf of the government as to its redactions within "certain documents that describe the contents of an informant's interview with the government," under Exemption 7(C) because "[i]t is understandable how the public disclosure of

highly confidential details about terrorist activities might be traced to particular individuals."), *aff'd*, No. 98-5465, 1999 WL 1215779 (D.C. Cir. Nov. 5, 1999).  Seidel's Declaration is specific as to what information is being withheld and why the privacy interests  outweigh any public interest; its representations are neither conclusory nor vague, nor is there any evidence of bad faith, and the plaintiff has presented no evidence to the contrary.  *See id*.; *see also* Seidel Decl. ¶¶ 53–69.

For all of these reasons, the Court concludes that the FBI's withholdings were proper under Exemption 7(C), and that it released all segregable information as it relates to this Exemption.

D.  5 U.S.C. § 552(b)(7)(D) ("Exemption 7(D)")

As discussed above, the FBI also relies on Exemption 7(D) for some of its withholdings. *See* Seidel Decl. ¶¶ 72–77; VI at 1–10 (withholding in part Bates Nos. 1–11, 16–68, 71–148, 152–182, 184–374, 379–82, 386–99, 401–11).  Exemption 7(D) protects "records or information compiled by criminal law enforcement authorities in the course of criminal investigations if their release could reasonably be expected to disclose the identity of, as well as information provided by, a confidential source." *Comp. Prof'ls*, 72 F.3d at 905; *see* 5 U.S.C. § 552(b)(7)(D).

Here, the FBI withheld the names, identifying personal data, and the investigative information provided by sources who received implied assurances of confidentiality from the agency.  *See* Seidel Decl. ¶¶ 75–77.  Indeed, "[a] source is confidential within the meaning of [E]xemption 7(D) if the source provided information under an express assurance of confidentiality *or* in circumstances from which such an assurance could be reasonably inferred." *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (quotation omitted) (emphasis added). There is no general "presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information [to a law enforcement agency] in the course of a criminal

investigation." *DOJ v. Landano*, 508 U.S. 165, 181 (1993). Rather, a source's confidentiality must be determined on a case-by-case basis. *Id.* at 179–80. "[T]he focus should always be on whether the source of the information spoke with the understanding of confidentiality, not whether the document is generally thought to be confidential." *Brown v. FBI*, 873 F. Supp. 2d. 388, 406 (D.D.C. 2012) (citing *Landano*, 508 U.S. at 172).

The FBI protected these sources, who were under the impression that their communications were confidential, due to the "critical information [that they conveyed] regarding the San Bernardino shooting. These individuals provided specific, detailed information that is singular in nature—i.e., only a few individuals would be privy to such information[,]" including "locations in or near the building where the shooting occurred and their specific actions during the shooting." Seidel Decl. ¶ 76. Furthermore, many of these sources "were coworkers of one of the investigative subjects and some sources interacted with this coworker the day of the shooting." *Id*. ¶¶ 75–76. Seidel also explains that the "highly violent nature of the mass shooting described in the records at issue attests to the fact that anyone cooperating with a law enforcement investigation concerning this terrorist attack would want and expect confidentiality[,]" and "[a]lthough the suspected shooters are deceased, like-minded individuals or others sympathetic to the San Bernardino suspects could seek to deter a source's cooperation with law enforcement through reprisal[,]" or to seek retribution against the source and their family, by engaging in acts of harassment, defamation, threats, or violent acts, including murder. *Id.* ¶ 76. Put differently, the information they provided is "singular in nature," and just like their names and contact information, such disclosure could easily expose like their identities. *See id.* ¶¶ 73, 76.

Finally, the FBI maintains that it "would forever eliminate that source as a future means of obtaining information[,]" and exposure would create a "chilling effect on the activities and

cooperation of other sources[,]" thus undermining "the FBI's most important means of collecting information and could thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws." *Id*. ¶ 74.

Given these detailed sworn representations, the Court is satisfied that the sources received implied confidentiality, and that Exemption 7(D) was properly invoked.  The Court takes into account all of the extant circumstances in assessing whether these sources plausibly received implied assurances, *see Roth*, 642 F.3d at 1184, including "the nature of the crime and the source's relation to it[,]" *Landano*, 508 U.S. at 179, and finds it noteworthy that courts in this Circuit have consistently recognized the violence and risk of retaliation attendant to "disclosure of the identities of or information provided by confidential sources . . . in circumstances where the subject of the investigation is known to have committed serious or violent offenses and where the sources are at risk of retaliation, harassment or bodily harm."  *Holt v. Dep't of Justice*, 734 F. Supp. 2d 28, 46 (D.D.C. 2010) (affirming the protection of source information arising from a murder investigation, due to implied confidentiality under Exemption 7(D)) (citations omitted); *see Williams*, 69 F.3d at 1159–60 (concluding that sources who spoke to the FBI regarding a nationalist organization "suspected . . . of committing . . . rebellion or insurrection, seditious conspiracy, and advocating the overthrow of the government," and which demonstrated its "willingness to use violence against its enemies," did so under an implicit assurance of confidentiality); *Pinson v. Dep't of Justice*, 177 F. Supp. 3d 56, 89 (D.D.C. 2016) (affirming withholding of information regarding  sources with implied confidentiality under Exemption 7(D) where plaintiff sought records regarding the law enforcement investigation of a "shooting death").

Indeed, and as here, singular information provided to assist "[i]nvestigations into domestic terrorism have been recognized as a sort of criminal investigation where an implicit grant of

confidentiality will be found." *Jud. Watch, Inc. v. Reno*, No. 00-cv-0723, 2001 WL 1902811, at *9 (D.D.C. Mar. 30, 2001) (citing *Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 48–49 (D.D.C. 1999) (finding implied confidentiality for sources assisting in an investigation into a bombing)); *see Shaw v. Dep't of Justice*, 559 F. Supp. 1053, 1064 (D.D.C. 1983) (finding implied confidentiality under Exemption 7(D) as to sources who provided information regarding a terrorist plot); *Shapiro*, 2020 WL 3615511, at *44 (entering summary judgment as to ATF's withholdings under Exemption 7(D) because the "crime at issue involve[d] domestic terrorism and the use of explosives[,]" which are "certainly serious or violent crimes that weigh in favor of a finding of [implied] confidentiality[,]" and because the sources provided "singular information" during the investigation) (internal citations and quotation marks omitted); *Owens v. Dep't of Justice*, No. 04-cv-1701, 2007 WL 778980, at *11 (D.D.C. Mar. 9, 2007) (identifying investigations of terrorist attacks as a circumstance that warrants an inference of implied source confidentiality under Exemption 7(D)).

In response, the plaintiff argues that the confidential sources' descriptions of the shooters, where redacted under Exemption 7(D), should be released because that particular information cannot be used to identify the confidential sources. *See* Pl.'s Opp'n at 8; Surreply at 13–16. He speculates that the information that the FBI already released to him put these sources at greater risk than revealing the descriptions of the shooters, which he claims has "no rational link" to the sources' identities. *See* Pl.'s Opp'n at 8–11; Surreply at 13, 15–16. However, "the availability of Exemption 7(D) depends not upon the factual contents of the document sought, but upon whether the source was confidential and the information was compiled during a criminal investigation." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1492 (D.C. Cir. 1984) (citing *Lesar*, 636 F.2d at 492); *Blanton*, 63 F. Supp. 2d at 48 ("[T]he relevant inquiry is 'not whether the requested *document* is

of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential.'") (quoting *Landano*, 508 U.S. at 172) (emphasis in original); *Parker v. Dep't of Justice*, 934 F.2d 375, 380 (D.C. Cir. 1991) (holding that "once the agency receives information from a confidential source during the course of a legitimate criminal investigation . . . [,] all such information obtained from the confidential source receives protection") (citing *Lesar*, 636 F.2d at 492 & n.114).  Here, there is no question—nor is there any dispute from the plaintiff—that the FBI's sources were confidential, and that the information was compiled during a criminal investigation. *See, e.g.,* Seidel Decl. ¶¶ 73–77.  Consequently, the content at issue, namely, the descriptions of the shooters, is irrelevant to the analysis of the propriety of the withholdings under Exemption 7(D).

The plaintiff also argues that the sources' descriptions of the shooters should be released because the incident was "a widely known event at a widely known time and place, publicized by the national news, and acknowledged by the general public."  Pl.'s Opp'n at 9.  But, assuming the plaintiff's representations to be true, it is of no consequence.  "[E]ven assuming, *arguendo*, that some of the withheld information has appeared in the press, the nondisclosure is proper because a disclosure from an official source of information previously released by an unofficial source would confirm the unofficial information and therefore cause harm to third parties."  *Fisher v. Dep't of Justice*, 772 F. Supp. 7, 12–13 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992).

The plaintiff also relies on the purported public interest in disclosure of this information, *see* Pl.'s Opp'n at 10–11, and cites to *Dep't of State v. Ray*, 502 U.S. 164 (1991), *see* Opp'n at 9–11.  But the plaintiff's reliance on that case is misplaced because, in *Ray*, the Supreme Court found unanimously that personal information concerning refugees returned to Haiti was indeed properly withheld from release.  *See Ray*, 502 U.S. at 179.  Moreover, even if the holding in *Ray* somehow

worked to the plaintiff's advantage, that case is inapposite to the circumstances in this matter.  In
*Ray*, the redacted information came from voluntary interviewees, not government sources, and the
redactions were made pursuant to Exemption 6, not Exemption 7(D), *see id.* at 170–71, which
require different standards of analysis.  Indeed, the plaintiff's "appeal to a public interest in
disclosure is unavailing as a matter of law[,]" *Jud. Watch*, 2001 WL 1902811, at *9, because
Exemption 7(D) does not require any balancing of the public interest, *see id.* (citing *Dow Jones &
Co. v. Dep't of Justice*, 917 F.2d 571, 575–76 (D.C. Cir. 1990)).  Consequently, the Court finds
the plaintiff's arguments unavailing.

For all of these reasons, the Court finds that the FBI's reliance on Exemption 7(D) is proper
and finds no defect in the FBI's segregability analysis arising therefrom.

E.  5 U.S.C. §§ 552(b)(7)(E) ("Exemption 7(E)")

Finally, the FBI invokes Exemption 7(E), *see* Seidel Decl. ¶¶ 78–88, which protects from
disclosure law enforcement records, "to the extent that the production of such law enforcement
records or information . . . would disclose techniques and procedures for law enforcement
investigations or prosecutions, or would disclose guidelines for law enforcement investigations or
prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[,]"
5 U.S.C. § 552(b)(7)(E).   The plaintiff does not express opposition to the FBI's use of Exemption
7(E).

Under this Exemption, this Circuit has "set a relatively low bar for the agency," requiring
it only to "demonstrate logically how the release of the requested information might create a risk
of circumvention of the law." *Blackwell*, 646 F.3d at 42.  Any information that "could increase the
risks that a law will be violated" is protected from disclosure. *Mayer Brown LLP v. IRS*, 562 F.3d
1190, 1193 (D.C. Cir. 2009); *see Fisher*, 772 F. Supp. at 12 (upholding the FBI's decision to

33

withhold information about law enforcement techniques where disclosure would impair effectiveness and, within the context of the documents, could alert subjects of investigations "about techniques used to aid the FBI").  Here, the FBI easily meets this low bar.

The FBI withheld four categories of information under Exemption 7(E), *see* Seidel Decl. ¶¶ 80–88, all of which the Court finds to be proper.  First, it withheld "sensitive file numbers[,]" Seidel Decl. ¶¶ 80–83; VI at 1–10 (withholding in part Bates Nos. 1–42, 46, 49, 53, 57, 60, 64, 66, 69–115, 119, 123–48, 152–82, 184–286, 288–364, 368, 372, 376, 379, 383, 386, 390, 395, 399–411), which consist of (1) classification numbers, (2) two-letter internal office codes, and (3) numbers assigned to the underlying "investigative initiatives[,]" Seidel Decl. ¶¶ 80–82.  Seidel explains that releasing these confidential identifiers would reveal "the investigative interest or priority given to such matters."  *Id*. ¶ 80.

More specifically, he indicates that public knowledge of the classification numbers in the context of the Inland investigation would expose "key non-public information about the FBI's investigative strategies and gathered evidence . . . [, and] information about non-public investigative techniques and procedures[,]" thus providing "criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing whenever such file classification numbers are present within these and other sensitive FBI investigative records."  *Id.*  He also indicates that exposing the office codes

> would reveal critical information about where and how the FBI detected particular criminal behaviors or national security threats, and reveal key pieces about the FBI's non-public investigations or intelligence and evidence gathering sources and methods . . . [,][and] risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests in varying  areas of FBI investigative responsibility[,] [and its] failure to detect certain types of criminal behavior.

*Id.* ¶ 81.  He further represents that, in doing so, criminals or would-be criminals in cities without associated originating office codes could "assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities, undeterred."  *Id*.  And Seidel further represents that revealing the investigation numbers "would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular investigations within the context of larger FBI investigative efforts," because a wrongdoer could discern "how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies[,]" which would allow them to see how "FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows[,] including when and how they obtained the knowledge, and if there are knowledge gaps in the FBI's gathered intelligence."  *Id.* ¶ 82.

Given this detailed information, the FBI "demonstrate[s] logically how the release of the requested information might create a risk of circumvention of the law," *Blackwell*, 646 F.3d at 42 (internal quotation marks omitted), and it identifies the harms attendant to the disclosure of these file numbers.  Therefore, the Court finds that these redactions are appropriate under Exemption 7(E).  *See Poitras v. Dep't of Homeland Security*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (affirming the defendant's withholding of sensitive file numbers under Exemption 7(E)).

Second, the FBI also protected an official "direct line" "non-public telephone number of an FBI employee."  Seidel Decl. ¶ 84; VI at 10 (withholding in part Bates No. 409).  Seidel attests that such release would put the agency at risk for an attack on its secure communications by way of "spoofing," and other acts of fraud, "to elicit sensitive information[.]"  Seidel Decl. ¶ 84.  He asserts that this disclosure could cause "substantial risks to the FBI's ability to carry out its mission effectively, could potentially decrease the FBI's effectiveness by devaluing public trust, and could

enable criminals to circumvent the law."  *Id.*  Considering the nature of the documents in which the telephone number was contained, together with Seidel's specific representations regarding this redaction, the Court is satisfied that the FBI has demonstrated that this phone number could be used in furtherance of potential fraudulent acts, and could lead to disruption of the FBI's activities, or to the harassment and intimidation of its officials.  *See Shapiro v. Dep't of Justice*, 78 F. Supp. 3d 508, 520 (D.D.C. 2015) (affirming the FBI's redaction of an internal phone number under Exemption 7(E)).

Third, the FBI withheld "database identifiers" under Exemption 7(E).  Seidel Decl. ¶¶ 85–87; VI at 8 (withholding in part Bates Nos. 333–34).  These identifiers correspond to "the identity of and query data from a sensitive non-public investigative database used for official law enforcement purposes by the FBI[,]" and Seidel identifies multiple ways in which disclosure of such information would aid criminals in acquiring "insight into the available tools and resources the FBI uses to conduct criminal and national security investigations[,]" and endanger the FBI's investigative function and effectiveness by, for example, "revealing exactly where the FBI is storing and obtaining valuable investigative data[,]" and rendering the FBI vulnerable to cyberattack.  *See id.* ¶¶ 85–86.  Furthermore, release of the identifiers would "allow criminals who gain access to FBI systems insight into where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies[,]" and provide an "opportunity to corrupt or destroy information stored within these databases."  *Id*. The FBI has thus met its low burden to show that this information was properly redacted under Exemption 7(E).  *See Kendrick v. FBI*, No. 20-cv-2900, 2022 WL 4534627, at *8 (upholding the FBI's withholding of database-related information under Exemption 7(E)) (citing *Shapiro v. Dep't of Justice*, 393 F. Supp. 3d 111, 122 (D.D.C. 2019) (noting that courts "generally have affirmed

36

the withholding of information related to databases—metadata, codes, and structures—under Exemption 7(E) for risk of cyber-attack or data breach.") (collecting cases)).

Fourth, the FBI "protected the methods the FBI uses to collect and analyze information it obtains for investigative purposes." Seidel Decl. ¶ 88; VI at 2–3, 9 (redacting in part Bates Nos. 46, 49, 53, 57, 60, 64, 66, 115, 119, 364, 368, 372, 376, 379, 383, 386, 390, and 395). The Court agrees that the FBI properly withheld this information, as it relates to its investigative efforts of subjects of interest and their engagement in criminal activity. *See* Seidel Decl. ¶ 88. The FBI represents that releasing such information would, *inter alia*, "enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities." *Id*. Thus, these withholdings were also proper under Exemption 7(E). *See Kendrick*, 2022 WL 4534627, at *9 (holding same) (citing *Shapiro v. Dep't of Justice*, 893 F.3d 796, 800 (D.C. Cir. 2018) (holding same)).

IV.    In Camera Review

The plaintiff requests that the court conduct *in camera* review to determine the propriety of the redactions of the descriptions of the perpetrators, made under Exemption 6 and 7(C), and Exemption 7(D), specifically as it relates to their segregability. *See* Pl.'s Opp'n at 32–33; Surreply at 23–24. The FOIA authorizes the Court, at its discretion, to examine the contents of agency documents *in camera*. *See* 5 U.S.C. § 552 (a)(4)(B). "*In camera* inspection may be appropriate in two circumstances: when agency affidavits are insufficiently detailed to permit meaningful review of exemption claims, and when evidence of agency bad faith is before the court." *Lam Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C. Cir. 1991). Neither situation is presented here. The FBI has

adequately described the segregability analysis it conducted, *see* Seidel Decl. ¶¶ 90–92, in combination with its *Vaughn* Index, and has provided sufficient justification for its redactions and withholdings under the exemptions it invoked.  Moreover, there are no allegations or evidence in the record to suggest bad faith by the FBI.  Consequently, the request for *in camera* review is denied.  *See Pinson*, 177 F. Supp. 3d at 90.

## CONCLUSION

For the foregoing reasons, the FBI's Motion for Summary Judgment is granted.  An Order consistent with this Memorandum Opinion will be issued contemporaneously.

Date: August 18, 2023

_____/s/_____
REGGIE B. WALTON
Senior United States District Judge
